**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHINUA ANDERSON,

     Petitioner,

     v.

BRUCE DAVIS *et al.*,

     Respondents.

Case No. 22cv4787 (EP)

**OPINION**

**PADIN, District Judge.**

*Pro se* Petitioner Chinua Anderson, a convicted and sentenced New Jersey state prisoner, brings a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 against Respondents Bruce Davis and the Attorney General of the State of New Jersey ("Respondents"). D.Es. 1 and 1-1 (collectively "Petition"). Anderson challenges his Judgment of Conviction & Order for Commitment for murder and weapons charges in the Superior Court of New Jersey, Hudson County. D.E. 8-2 at Ra36–40 ("Judgment"). Respondents filed an Answer in opposition to the Petition. D.E. 8 ("Answer").[1]

The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b). For the reasons discussed below, the Court will **DENY** the Petition and **DENY** a certificate of appealability.

## I.    BACKGROUND

Anderson seeks habeas relief under 28 U.S.C. § 2254 from his convictions for first-degree

---

[1] Respondents physically supplemented their Answer with additional state court records in response to this Court's August 5, 2025 text order. D.E. 9.

murder (count one); third-degree possession of a weapon for an unlawful purpose, specifically a knife (count two); fourth-degree unlawful possession of a weapon, a knife (count three); and second-degree certain persons not to have weapons (count four). *State v. Anderson*, No. A-4654-13T3, 2017 WL 2472364, at *1 (N.J. Super. Ct. App. Div. June 8, 2017) (per curiam) ("*Anderson I*"). Anderson is serving an aggregate thirty-year prison term with thirty years of parole ineligibility. Judgment at Ra36. On habeas review, district courts must presume the state court factual findings are correct. 28 U.S.C. § 2254(e)(1). These findings of fact, however, are rebuttable if petitioner brings forth clear and convincing evidence. *Id.* The Court begins with the factual findings of the New Jersey Superior Court, Appellate Division on Anderson's direct appeal of his convictions and sentence. *Anderson I.*

On May 2, 2011, Jersey City Police Officer Gregory Wojtowicz responded to a report of an assault at a liquor store. *Id.* at *1. In the liquor store, he observed a black male lying face down on the floor, unable to speak or move. *Id.* The victim was taken to a hospital, where he was reported dead. *Id.* The victim's autopsy showed he had been stabbed nine times and the State's expert pathologist declared homicide the manner of death. *Id.* Detectives did not recover any weapons from the victim. *Id.*

There were security cameras in the liquor store. *Id.* at *2. Officer Wojtowicz viewed the footage and obtained a description of the victim and the suspect. *Id.* Taking still images from the surveillance footage, a detective from the Hudson County Prosecutor's Office was able to observe the suspect from various angles and described him as "a black male, approximately [five feet and seven inches tall], [with a] bushy beard, black, thick-framed glasses, gold front teeth, wearing a[n] Army-style fatigue jacket, a maroon-colored Yankee baseball hat, [and] carrying a black messenger-type bag with light writing on it." *Id.*

2

The day after the murder, detectives from the Hudson County Prosecutor's Office observed a man matching that description on the sidewalk. *Id.* They told him why they wanted to speak with him, showed him a photograph from the surveillance video, asked him whether it was him, and asked where he had been the night before. *Id.* Anderson denied it was him in the photo and said he was with his wife . *Id.* He also denied possessing any weapons. *Id.* Anderson called his wife, who confirmed with the detectives she was with Anderson the previous night. *Id.* The detectives photographed Anderson and then allowed him to leave. *Id.* As he was walking away, a detective saw a knife blade protruding from Anderson's pocket. *Id.* Detectives seized the knife along with another concealed folding knife Anderson possessed and arrested him. *Id.*

The State seized a DNA-stained jacket from Anderson's bedroom. *Id.* One stain came from Anderson; testing on the other stains could not exclude Anderson or the victim. *Id.* There was also a DNA stain matching the victim on the blade of the knife confiscated from Anderson's pocket upon his arrest, and a DNA stain that matched Anderson on the handle of the knife. *Id.*

At trial, Anderson testified that he was a commercial truck driver who carried a knife to cut boxes, cords or plastic. *Id.* In the afternoon or evening of May 2, 2011, on his way home, he stopped at a liquor store to buy juice for his wife. *Id.* He first had a conversation with a woman outside the store. *Id.* He was in a good mood and interacted with people in the store. *Id.* When he left the store, he saw the same woman, who seemed intoxicated. *Id.* He told her he did not have any change for her, and he went back in the store to confirm with the clerk that he did not receive any change. *Id.* Anderson went outside and spoke to the woman. *Id.* A man suddenly came out of nowhere at a fast, aggressive pace. *Id.* at *3. The man was bigger than Anderson, and he came right up to his face and began arguing with him. *Id.* When the man raised a metallic object in his hand as if to strike Anderson, he grabbed his own knife and swung it at the victim to

disarm him. *Id.* The two fought for two or three minutes. *Id.* Anderson did not believe the victim suffered any injuries and did not hear him cry out in pain. *Id.* He followed the victim into the liquor store to be sure the victim did not pursue him. *Id.*

Anderson admitted he was on the liquor store's security footage but testified that it captured only part of the fight. *Id.* After the victim fell inside the store, Anderson grabbed his belongings and ran, without waiting for the police. *Id.* He dropped the knife on his way home but retrieved it the next day. *Id.* He was too upset to call the police when he arrived home. *Id.* In hindsight, Anderson admitted he could have escaped the fight without stabbing the victim. *Id.*

At trial, the court changed the substance of the jury charge, without objection. *Id.* The court agreed to Anderson's request to charge passion/provocation manslaughter, although defense counsel did not intend to argue it. *Id.* In summation, defense counsel argued Defendant acted in self-defense and the State failed to disprove the defense beyond a reasonable doubt. *Id.*

The jury instruction on self-defense tracked the model jury charge and included:

Burden of proof. The State has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue. This defense only applies if all of the elements previously described exist. . . . If the State carries its burden then you must disallow the defense. If the State does not satisfy this burden and you have . . . a reasonable doubt[,] then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.

*Id.* The trial court also instructed the jury on murder and passion/provocation manslaughter, in relevant part: "[a] person is guilty of murder if he, one, caused the victim's death or serious bodily injury that then resulted in death. And, two, that the defendant did so purposely or knowingly. And, three, did not act in the heat of passion resulting from a reasonable provocation." *Id.* The instruction continued:

> The third element that the State must prove beyond a reasonable doubt to find the defendant guilty of murder is that the defendant did not act in the heat of passion resulting from a reasonable provocation. Passion provocation manslaughter is a death caused purposely or knowingly that is committed in the heat of passion, resulting from a reasonable provocation.

*Id.* at 4.  The court explained the factors distinguishing passion/provocation manslaughter from murder and instructed the jury that if it determined the State disproves passion/provocation manslaughter beyond a reasonable doubt, "and in addition . . . you determine that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death[,] you must find the defendant guilty of murder." *Id.*  The trial court instructed the jury that if it determined the State had not disproved passion/provocation manslaughter beyond a reasonable doubt, then it should find Anderson guilty of passion/provocation manslaughter. *Id.*

Next, the trial court instructed the jury on aggravated and reckless manslaughter and the elements of the weapons offenses. *Id.*  Near the end of the charges of the weapons offenses, the trial court reminded the jury that Anderson's main argument was that he used the knife to defend himself, and explained, "if the defendant had an honest though unreasonable belief that he needed to use the weapon to protect himself, this negates the purposeful mental state required for [possession of a weapon for an unlawful purpose]." *Id.*  The trial court further charged:

> [e]arlier in this charge I instructed you on the concept of self-defense as it applies to the offenses of murder, passion provocation manslaughter, aggravated manslaughter, and reckless manslaughter. The concept of self-defense as it applies to those offenses is different than that of protective purpose that applies to [possession of a weapon for an unlawful purpose] . . . [w]hen applied to those offenses[,] self-defense requires a defendant to have an honest and a reasonable belief in the need to use force.

*Id.*

During deliberations, the jury requested and was permitted to watch the liquor store's video surveillance footage and take notes. *Id.* Defense counsel objected to the video playback but not to the note-taking. *Id.* The trial court gave the model jury charge instruction on playback of testimony and instructed the jury not to give undue weight to the surveillance footage. *Id.*

The jury convicted Anderson. Judgment at Ra36. The Appellate Division denied Anderson's direct appeal on June 8, 2017. *Id.* at 1. Subsequently, the New Jersey Supreme Court denied Anderson's petition for certification. *State v. Anderson*, 177 A.3d 107 (N.J. 2017) ("*Anderson II*").

On January 5, 2018, Anderson sought post-conviction relief ("PCR"). D.E. 8-2 at Ra140–144 ("Verified Petition for PCR"). Anderson supplemented his petition by his PCR counsel's letter brief on August 24, 2018. D.E. 8-2 at Ra168–213 ("Letter Brief"). The PCR court heard oral argument and denied relief on November 26, 2018, for the reasons stated on the record. D.E. 8-21 ("PCR Tr.") On February 12, 2021, the Appellate Division affirmed the PCR court's order denial of post-conviction relief. *State v. Anderson*, No. A-2799-18, 2021 WL 529182, at *5 (N.J. Super. Ct. App. Div. Feb. 12, 2021) ("*Anderson III*"). The Supreme Court of New Jersey denied Anderson's petition for certification. *State v. Anderson*, 262 A.3d 416 (N.J. 2021) ("*Anderson IV*"). Therefore, the Petition is ripe for review.

## II.    HABEAS ANALYSIS

### A.    Habeas Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which amended 28 U.S.C. § 2254, a district court "shall entertain an application for writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254.  Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition, based upon the record that was before the state court.  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

District courts are required to give great deference to the determinations of the state trial and appellate courts.  *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).  Specifically, district courts must defer to the last reasoned decision of the state courts on the petitioner's claims.  *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (citation modified).  Where a claim has been adjudicated on the merits by the state court, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  "Clearly established federal law for purposes of [Section 2254(d)(1)] includes only the holdings, as opposed to the dicta of [the United States Supreme] Court's decisions."  *Woods v. Donald*, 575 U.S. 312, 316 (2015).  The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002).

Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (citation modified). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Renico*, 559 U.S. at 773. "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316. Relief under § 2254(d)(1) requires a finding "that no fairminded jurist could reach the state court's conclusion[.]" *Brown v. Davenport*, 596 U.S. 118, 135 (2022).

Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Court turns to the analysis of the Petition.

## B.     Ground One of the Petition: The Jury Instructions

In Ground One of the Petition, Anderson contends that the jury received inadequate or misleading jury instructions that undermined his constitutional right to due process and a fair trial. Petition at 3–4. Specifically, Anderson claims "the jury instructions so completely separated the issues of self-defense and jury deliberation regarding the elements of the crime of murder that the jury was left without proper guidance on how to deliberate on the murder count while simultaneously considering the issue of self-defense." *Id.* at 1. He asserts that the isolated jury instruction on self-defense was inconsistent with the jury instruction on murder. *Id.* He further argues that the trial court should have instructed the jury on the absence of self-defense as an

8

element of murder.  *Id.* at 4.  Respondents contend that Anderson has not established any error in the jury instruction, and Anderson admits the self-defense instruction itself was proper.  Answer at 19.

The Appellate Division on direct appeal analyzed Anderson's challenges to the jury instructions under the New Jersey plain error review standard:[2]

> Applying these principles to the case now before us, we conclude it was not plain error to structure the charge in the manner the trial court structured it. The trial court made clear at the outset of its charge on the substantive offenses, as to which defendant was claiming self-defense, that the State had the burden of disproving self-defense beyond a reasonable doubt. Immediately following the self-defense charge, the court instructed the jury on the elements of murder and manslaughter. Near the end of the charge, the court reminded the jury that earlier in the charge the court had "instructed you on the concept of self-defense as it applies to the offenses of murder, passion provocation manslaughter, aggravated manslaughter, and reckless manslaughter." The court thus harkened back to the portion of the charge in which the court had instructed the jury on the elements of self-defense and the State's burden of disproving the defense beyond a reasonable doubt. Considering the self-defense charge in the context of the overall instructions, we conclude the trial court did not commit plain error . . . . In summation, defense counsel told the jury, "there's no secret here[.]  [We are] submitting that he acted in self-defense." Defense counsel further emphasized:
>
> > Not only does the State have to prove that there was a murder. That will be part of the instructions. The State has to prove that it wasn't passion[/]provocation. Okay? That he wasn't just incited but it was still a murder except for passion[/]provocation. The State has to prove all those things to you.

---

[2] The Appellate Division described the plain error standard it applied:

> Plain error in this context is legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result. When reviewing a charge for plain error, an appellate court must not examine the portions of the charge alleged to be erroneous in isolation; rather, the charge should be examined as a whole to determine its overall effect.

*Anderson I*, at *5 (citation modified).

> And, on top of that, I don't have to convince you that it was self-defense. The State has to convince you beyond a reasonable doubt that it was not self-defense. Once again, just because we're advancing this defense . . . it's still the burden of the prosecution to come forward with evidence to convince you—to leave you firmly convinced that it wasn't self-defense.

> Defense counsel continued throughout his summation to emphasize defendant acted in self-defense, and the State had failed to carry its burden of disproving self-defense beyond a reasonable doubt. It is inconceivable that had defense counsel believed the jury charge somehow confused or prejudiced defendant's sole defense, he would not have lodged an objection.

*Anderson I*, at *5–6.

The Due Process Clause requires the prosecution to prove every element of the charged offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). On federal habeas review, whether jury instructions impaired this due process right is evaluated first by focusing "on the specific language challenged." *Francis v. Franklin*, 471 U.S. 307, 315 (1985). The instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 75 (1991). (citation modified). The Supreme Court has also held, as a general proposition, that a defendant has a due process right to have the jury instructed on any recognized defense for which there is sufficient evidence in the record for a reasonable jury to find in his favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988).

The Constitution permits a State to place the burden of persuasion to prove an affirmative defense on the defendant by a preponderance of the evidence, so long as the State proves all elements of the crime beyond a reasonable doubt. *Patterson v. New York*, 432 U.S. 197, 210–11 (1977) .

> [I]t is normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Id.* at 201–02 (1977) (citation modified).

Under New Jersey law, self-defense is treated as a justification defense, not as an element of homicide offenses. *See* N.J. Stat. Ann. § 2C:3-4. If a self-defense charge is requested by the defendant and "supported by some evidence in the record, it must be given" at trial. *State v. Macchia*, 290 A.3d 182, 194 (N.J. 2023) (citation modified). Once evidence of self-defense is introduced, the State must disprove self-defense beyond a reasonable doubt. *Id.*

Here, the Appellate Division properly reviewed the jury instructions as a whole, in the context of the entire trial. Fairminded jurists could agree with the Appellate Division's conclusion that the instructions properly conveyed the State's burden to disprove self-defense beyond a reasonable doubt, and that the proper standard was reinforced by defense counsel's summation, precluding any prejudice to Anderson. Accordingly, Ground One of the Petition is denied.

### C.    Ground Two of the Petition: The Jury's Notes

In Ground Two of the Petition, Anderson argues that the trial court's decision to allow jurors to take notes while reviewing the surveillance video during deliberations was an abuse of discretion, and that the failure to give a model jury instruction on note-taking resulted in a denial of his right to due process and a fair trial. Petition at 5–7. Respondents argue the claim is not cognizable on habeas review. Answer at 34.

An error in the application of state law is not cognizable on federal habeas review unless the error "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75. Anderson has not identified a Supreme Court decision, nor has this Court located any, addressing juror note-taking during the playback of admitted evidence. Thus, the Court considers

only whether the failure to give a jury instruction on note-taking denied Anderson due process.

The Appellate Division rejected this claim because:

> a considerable quantum of evidence—including forensic testimony, DNA
> evidence, and surveillance—established defendant was the man who repeatedly
> stabbed the victim. Defendant's credibility was impeached not only by his initial
> denials to police that he was not the man in the surveillance video, but also by the
> surveillance video itself. The video depicted defendant persistently and
> aggressively pursuing and lunging at the unarmed victim as the victim persistently
> attempted to retreat from and avoid defendant's attack. One might aptly
> characterize defendant's self-defense testimony and argument to the jury as "don't
> believe your lyin eyes." Defendant's testimony concerning why he pursued the
> victim into the store bordered on frivolity. In short, defendant's testimony was
> manifestly incredible. Even if the trial court erred when it permitted the jury to take
> notes when it viewed the surveillance during deliberations—and we do not so
> conclude—the error was harmless beyond a reasonable doubt.

*Anderson I*, at *8.

The playback permitted the jurors to refresh their recollection of the video evidence during

deliberations. It is unlikely the jurors would return to deliberations and rely on their notes instead

of their recollection of the video they had just watched. Moreover, the finding of guilt was not

necessarily based solely on the jury's perception of the video evidence. The jury could reasonably

have rejected Anderson's self-defense claim based on Anderson's overall testimony, which was

aptly described as "border[ing] on frivolity." *Anderson I*, at *8. Therefore, fairminded jurists

could agree with the Appellate Division's determination that failure to give a jury instruction on

notetaking was harmless error. Accordingly, Ground Two of the Petition is denied.

### D.    Grounds Three Through Seven of the Petition: *Strickland*

In Grounds Three through Seven of the Petition, Anderson raises Sixth Amendment claims

of ineffective assistance of trial and appellate counsel. Petition at 7–22. The United States

Constitution guarantees the right of assistance of counsel to every person accused of a crime. U.S.

Const. amend. VI. The Sixth Amendment right to counsel protects the fundamental right to a fair

trial. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). To support an ineffective assistance of counsel claim under *Strickland*, a petitioner must show counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* at 687. The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed at the time of the challenged conduct. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

A petitioner also must affirmatively demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Id.* at 692–93. The petitioner must demonstrate "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Failure to satisfy either prong of the test defeats *a Strickland* claim "and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *Id.* at 697.

Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). *Richter*, 562 U.S. at 105. On deferential habeas review, "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* More specifically, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

       *1.    Ground Three of the Petition*

In Ground Three of the Petition, Anderson argues that trial counsel was ineffective for failing to investigate whether the drugs consumed by the victim rendered him irrational, aggressive, and insens[itive] to pain. Petition at 7–10. He contends that trial counsel should have hired an expert to provide testimony that corroborated Anderson's version of events—that he was "attacked by a drug induced stranger manifesting superman like euphoria." *Id.* at 9–10. Anderson raised these claims in his application for post-conviction relief. Verified Petition for PCR at 183–87. In support, he submitted a post-trial expert report from Dr. Mark Taff. *Id.* at 151–58.

Respondents argue that the victim's level of intoxication could not have helped Anderson establish that he acted in self-defense because it would have given Anderson more reason and opportunity to retreat. Answer at 30. Respondents also argue that the jury did not accept Anderson's claim of self-defense, and he cannot overcome the great weight of the evidence used to convict him. *Id.* at 29.

The Appellate Division on PCR appeal noted that while some of Anderson's claims were procedurally barred:

> [n]one of defendant's submissions, including the post-trial expert report of Dr. Taff opining on the probable impact of the victim's intoxication level, provide an even colorable basis to set aside defendant's convictions. Thus, we are satisfied that defendant failed to make a prima facie showing of IAC within the *Strickland/Fritz* test to warrant relief or an evidentiary hearing. *See State v. Reevey*, 417 N.J. Super. 134, 146-47 (App. Div. 2010) ("[I]t is within our authority to conduct a de novo review of both the factual findings and legal conclusions of the PCR court" where, as here, no evidentiary hearing was conducted (citations and internal quotation marks omitted)). We also conclude that the arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

*Anderson III*, at *5–6.

The PCR court cited several reasons for denying relief, noting that the surveillance video

"speaks for itself."[3]  PCR Tr. at 5:20–21.  Furthermore, the PCR court held that Anderson failed

to establish prejudice because the victim's intoxication was presented at trial through the medical

examiner's testimony, and "the [trial] judge, in fact, charged manslaughter in th[e] case."  *Id.* at

25:4–10.  The PCR court directly addressed the intoxication-expert claim as follows:

> Now in this case the Anderson claims two things, I'll call it the new report regarding
> the intoxication of the victim in this matter, and the failure to call the witness.
> Okay? I'm aware -- I did look at the video, I'm aware of the Appellate Division's
> decision in this matter and, you know, the defendant -- the Appellate Division found
> there to be -- I don't think they used the word overwhelming, but they found, I
> believe it said, mountain of evidence in this case against the defendant.

PCR Tr. at 22:15–23:19.

> The PCR court continued:

> Okay. Now in regard to the "new report" regarding . . . the victim's intoxication . . .
> [w]hile the jury did not consider this . . . [i]t was argued to the jury that
> manslaughter was appropriate[.] Provocation was argued by defense counsel and
> the lesser included was charged. So I can't find under *Strickland* either prong[.]

*Id.* at 25:4–26:3.

Fairminded jurists could similarly reach the conclusion that Anderson was not prejudiced

by counsel's failure to present expert evidence of the victim's intoxication.  Anderson's testimony

that he stabbed the victim nine times, his admission that he could have retreated or walked away,

and video surveillance footage showing Anderson chasing the fleeing victim with a knife make it

unreasonable to conclude the result of the proceeding would have been different based on the

victim's level of intoxication.  Accordingly, Ground Three of the Petition will be denied.

### 2.    *Ground Four of the Petition*

In Ground Four of the Petition, Anderson asserts his trial counsel was ineffective by failing

to request a charge of mistake of fact, consistent with his defense that he believed the metal object

---

[3] The Court, having viewed the surveillance video from the state court record, agrees with the
state court's description of the events depicted.

in the victim's hand was a weapon.  Petition at 10–11.  Respondents' position is that Petitioner "cannot overcome the crushing weight of the evidence used to convict him" to establish prejudice on any of his ineffective assistance of counsel claims.  Answer at 29.

The Appellate Division's denial of Anderson's claim as without sufficient merit to warrant discussion does not involve an unreasonable application of the *Strickland* standard.[4]  In New Jersey, a mistake of fact "is a defense if the defendant reasonably arrived at the conclusion underlying the mistake and . . . [the mistake] negatives the culpable mental state required to establish the offense."  *State v. Stuart*, No. A-3262-15T4, 2017 WL 3297468, at *11 (N.J. Super. Ct. App. Div. Aug. 3, 2017) (quoting N.J. Stat. Ann. § 2C:2–4a(1)).  The Appellate Division noted Anderson testified, in hindsight, that he could have escaped the fight without stabbing the victim. *Anderson I*, at *3.  Therefore, even if Anderson had mistakenly believed that the victim was carrying a weapon, such mistake would not have necessarily excused Anderson's culpability.

The evidence in the record supports the Appellate Division's finding that "[t]he video depicted defendant persistently and aggressively pursuing and lunging at the unarmed victim as the victim persistently attempted to retreat from and avoid defendant's attack."  *Anderson I*, at *8. Moreover, similar to a jury charge on whether a mistake of fact affected the jury's analysis of the defendant's state of mind, the jury was instructed on a range of offenses with lesser states of mind than knowingly committing murder.  On this record, fairminded jurists could agree Anderson failed to establish the prejudice prong of *Strickland*.  Accordingly, Ground Four of the Petition will be denied.

---

[4] With respect to Ground Four of the Petition, the PCR court stated "the attorney failed to discuss a mistake of fact, I believe I discussed that."  PCR Tr. at 27:5–6.  Upon review of the PCR transcript, it appears the PCR court did not specifically address this ineffective assistance of claim. The claim, however, was clearly rejected because the PCR court held Anderson failed to establish a *prima facie* case of ineffective assistance of counsel as to any claim in the PCR petition.  *Id.* at 31:16–32:18.

3.    *Ground Five of the Petition*

In Ground Five of the Petition, Anderson argues his trial counsel was ineffective for failing to call Andrew Ellerbe, the victim's nephew, who told police he saw "two men out there in a confrontation, fighting, which I thought was a fight." Petition at 11. Trial counsel informed the trial court he intended to call character witnesses because Petitioner had no criminal history, but counsel then failed to do so. *Id.* at 11–12. Respondents counter that Andrew Ellerbe's testimony would not have aided the defense because it would have corroborated what the jury saw on the surveillance video. Answer at 30–31. Respondents further argue that Anderson failed to submit certifications from the alleged character witnesses anyway. *Id.* at 31.

The PCR court addressed the claim concerning defense counsel's failure to call witnesses:

> Do I know if trial counsel spoke to the -- the witness? I don't know. I'll presume he did -- he or she did, but I'm not going to base my ruling on that. The evidence in this case seems to be that the -- the witness was a relative of the victim. And the statements that the witness gave were favorable to the State. So one will never know, including me, what a witness will say. As I say all of the time with a smile on my face, no one knows what a witness is going to say until they walk through the door, they -- they stand up, put their hand on the Bible, swear to tell the truth, they sit down, and they're asked the question, and they give the answer. So no one will ever know. But no reasonable attorney, no effective counsel would just call a witness with their fingers crossed saying I hope he or she is going to say the exact opposite that they told to the police. No, I wouldn't expect that and -- and to do that would probably -- to -- to call someone hoping they're going to say something different, without knowing, what did they tell us all in law school? Don't ask the question unless you know the answer? That's not reasonable to expect that the witness would come in and say the opposite. And, you know, he -- apparently the witness said that he saw the defendant pull out a knife, chase the -- chase the victim into a store, stab someone or poke someone, whatever words you want to use, nine times. It's not reasonable to expect that that person's going to change their mind when they come to the stand and that's certainly not ineffective assistance of counsel. That's just a bold—bold faced assertion.

PCR Tr. at 22:21–25:3. The PCR court added that in light of overwhelming evidence of Anderson's guilt, it was a matter of trial strategy for defense counsel not to call character witnesses. *Id.* at 27:17–21. The Appellate Division then affirmed the PCR court's denial of this claim without

17

explanation. *Anderson III.*

Fairminded jurists could agree that defense counsel's failure to call a witness who might corroborate the prosecution's case was sound trial strategy. Fairminded jurists could also agree that failure to present character witnesses to describe Anderson as nonviolent was of little value because the jury saw Anderson chasing and stabbing a fleeing victim. Accordingly, Ground Five of the Petition is denied.

### 4.    *Ground Six of the Petition*

In Ground Six of the Petition, Anderson asserts that his trial counsel was ineffective for failing to challenge the surveillance video on the ground that it had been altered and enhanced. Petition at 13–17. He further argues that the lighting conditions in the video were critical for the jury's assessment of whether his fear of serious bodily injury was reasonable. *Id.* at 16. Respondents counter that defense counsel challenged admissibility of the video in a *Driver* hearing, albeit unsuccessfully.[5] Answer at 32–33.

Indeed, the PCR court rejected this claim because the trial court found the video admissible after conducting a *Driver* hearing. PCR Tr. at 28:12–20; *see supra* n.5. Anderson's speculation that the video was altered or enhanced to make it appear lighter than it actually was outside fails to overcome the "strong presumption that counsel's conduct" at the *Driver* hearing "falls within

---

[5] *See* Transcript of Motions Hearing, D.E. 8-8 ("*Driver* Hearing Tr."). In *State v. Driver*, the New Jersey Supreme Court held sound recordings containing competent, relevant evidence are admissible if the speakers are identified and:

> (1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement[.]

183 A.2d 655, 672 (N.J. 1962), *holding modified by State v. Nantambu*, 113 A.3d 1186 (N.J. 2015).

the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, defense counsel, in summation, argued the surveillance video supported Anderson's claim of self-defense, calling the jury's attention to the fact that part of Anderson's interaction with the victim occurred right off camera and it was dark outside, making it difficult for Anderson to see what was coming at him in the dark. D.E. 8-17 ("Trial Tr.") at 47–49. Fairminded jurists could agree with the PCR court's rejection of this ineffective assistance of counsel claim. Accordingly, Ground Six of the Petition is denied.

5.    *Ground Seven of the Petition*

In Ground Seven of the Petition, Anderson asserts that appellate counsel rendered ineffective assistance by failing to raise the following issues on direct appeal: that the trial court erred (1) by permitting the jury to see an unauthenticated version of the surveillance video; (2) when it denied Anderson's motion to suppress evidence; (3) by denying Anderson the right to substitute counsel; (4) by refusing to allow Anderson to show surveillance video from another store; and (5) by refusing defense counsel's request to inform the jury about Anderson's medical condition. Petition at 18–22. Respondents contend that appellate counsel's exclusion of these claims on direct appeal was based on sound appellate strategy. Answer at 33.

The Appellate Division affirmed the PCR court's rejection of the ineffective assistance of appellate counsel without further discussion. The PCR court explained its decision:

> THE COURT: The attorney did not provide the Court with medical records pro --proving that defendant suffers from a disorder that makes him sweat a lot. I think that's one of the defendant's claims in this matter.
>
> MR. BURROUGHS: It is.
>
> THE COURT: It is. Okay. Again, that doesn't meet either prong of the Strickland test. I don't know really what that has to do, particularly when there's overwhelming evidence on a video.

PCR Tr. at 28:3–11.

The PCR court continued:

THE COURT: Okay. The appellate attorney failed to argue that the jury should not have viewed the unauthenticated surveillance video. For the same reasons, Judge Rose held a -- held a hearing in regard to the surveillance video and admitted it. The appellate attorney failed to argue that the trial court incorrectly decided the suppression motion regarding the stop. I've already -- same -- same ruling I -- I made in regard to the trial. The appellate attorney failed to argue that the trial court erred by not letting the defendant change attorneys. You know, you -- the Appellate Court discussed with -- with defendant, and it's not the Appellate Court who's allowing someone to change attorneys, so that that's -- that certainly doesn't meet the -- test of Strickland.

MR. BURROUGHS: No. It's the -- that the appellate attorney didn't raise this on -- on direct appeal.

THE COURT: The appellate attorney failed to argue that the trial court erred by not letting the defendant change attorneys.

MR. BURROUGHS: Correct.

THE COURT: Okay. Well, there's nothing in the records, frankly, that's a bold-faced assertion. There's nothing in the record to support that. The appellate attorney failed to argue that the trial court erred by refusing to allow defendant to show surveillance footage from the B.J.'s Store. You know, if -- if the defendant could have had the surveillance video from -- from the B.J.'s Store authenticated, it could have been admitted. It was not authenticated, et cetera. The appellate attorney failed to argue that the trial court erred in denying the defendant's motion for a judgment of acquittal or, in the alternative, to a new trial. For the reasons stated by the -- by the -- the trial judge, I'm going to deny the claim. And the appellate attorney failed to challenge the trial court's decision not to inform the jury of defendant's medical condition, the excessive sweating. I believe I already addressed the excessive sweating issue. The appellate attorney failed to challenge the trial court's decision not to dismiss the gun charge. You know, for the reasons set forth by the -- the trial judge in -- in not dismissing and denying the motion to dismiss, I'm going to deny that claim. And the appellate attorney failed to claim cumulative trial error. I believe I already discussed that, each and every one. Okay. I believe I've discussed each and every issue.

*Id.* at 29:7–31:9.

The Supreme Court has made clear that the Constitution does not impose a duty upon appellate counsel to raise *every* "colorable" claim. *Jones v. Barnes*, 463 U.S. 745, 754 (1983).

"For judges to second-guess reasonable professional judgments . . . would disserve the very goal of vigorous and effective advocacy[.]" *Id.*

Here, the PCR court denied each claim, essentially finding the proposed appellate claims had very little merit. The strategic decision to exclude weak claims, in favor of challenging the jury instructions, is entitled to substantial deference on habeas review. *See id.* at 751 ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible[.]"). Fairminded jurists could agree with the PCR court's rejection of the ineffective assistance of appellate counsel claims. Accordingly, Ground Seven of the Petition is denied.

## III.    CERTIFICATE OF APPEALABILITY

This Court must next determine whether a certificate of appealability should issue. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c).

For the reasons discussed above, this Court's review of the claims advanced by Anderson demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue. Therefore, the Court declines to issue a certificate of appealability. 28 U.S.C. § 2254(b)(1)(A).

IV.    **CONCLUSION**

For the reasons discussed above, the Court will **DENY** habeas relief and will not issue a certificate of appealability.  An appropriate Order follows.


Dated: September 24, 2025

_Evelyn Padin_
Evelyn Padin, U.S.D.J.